## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STEPHANIE HOWELL                               )        CASE NO. 3:20-CV-01150 (KAD)
    *Plaintiff,*                              )
                                             )
v.                                             )
                                             )
CITY OF MERIDEN ET AL.                         )        SEPTEMBER 30, 2023
    *Defendants.*                             )


## MEMORANDUM OF DECISION
## RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 70)

Kari A. Dooley, United States District Judge:

This civil rights action arises out of an interaction between Plaintiff, Stephanie Howell, and members of the Meriden Police Department ("MPD"), Officers Michael Lounsbury and Ethan Busa on March 18, 2018. Plaintiff sues the city of Meriden, Officers Lounsbury and Busa, as well as the chief of MPD, Jeffry Cosette (collectively, the "Defendants") pursuant to 41 U.S.C. Section 1983 for injuries she sustained when Officers Lounsbury and Busa allegedly violated her constitutional rights under the Fourth Amendment.[1] Pending before the Court is Defendants' motion for summary judgment in which they assert that they are entitled to judgment, as both officers are entitled to qualified and governmental immunity. Plaintiff opposes the motion and asserts that there are genuine issues of material fact as to the cause of her injuries as well as whether the Defendants are entitled to qualified immunity. For the reasons set forth below, Defendants' motion is GRANTED as to the federal claims (Counts 1, 2, 3, 6, 7) and the Court declines to exercise supplemental jurisdiction over the state law claims (Counts 4, 5, 8, 9).

---

[1] Plaintiff also brings state law claims of negligence and negligent infliction of emotional distress and seeks municipal indemnification or liability pursuant to Conn. Gen. Stat. § 7-465 and §52-577n.

**Standard of Review**

The standard under which motions for summary judgment are decided is well known and well established. Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Significantly, the inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. The moving party bears the burden of showing "that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

If the moving party meets this burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In deciding a motion for summary judgment, the Court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Beyer v. Cnty. Of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *See Anderson*, 477 U.S. at 249–50 (citations omitted). Importantly, "[a]ssessments of credibility and choices between conflicting

versions of the events are matters for the jury, not for the court on summary judgment." *Adamson v. Miller*, 808 F. App'x 14, 16 (2d Cir. 2020) (summary order) (internal quotation marks omitted).

**Facts[2]**

On March 18, 2018, Plaintiff attended a baby shower at Violi's Restaurant ("Violi's") in Meriden, Connecticut. *See* Def. Local Rule Statement ("LRS"), ECF No. 71, at ¶ 4. At the baby shower, Plaintiff consumed alcohol. *See id.* at ¶ 5. The parties agree that after the shower concluded, Plaintiff was not feeling well. *See id.* at ¶ 6; *see also* Pl. LRS, ECF No. 75-1, at ¶ 6. Defendants assert that Plaintiff was heavily intoxicated and therefore unable to drive herself home. Plaintiff denies being intoxicated and states that she never had any intention of driving herself home regardless. *See id.* Defendants Lounsbury and Busa, who were both acting in their capacities as officers of the Meriden Police Department ("MPD") and employees of Defendant City of Meriden ("Meriden")[3], were called to Violi's by the restaurant owner. Officer Lounsbury was first on the scene, and he encountered Plaintiff near her vehicle. *See* Def. LRS at ¶¶ 1–2; 7. Defendants assert that Plaintiff was given the opportunity to call someone for a ride home or to go to the hospital for detoxification, which Plaintiff denies. *See id.* at ¶ 8; *see also* Pl. LRS at ¶ 8. During Plaintiff's interaction with Officers Lounsbury and Busa, she used obscenities (calling Officer Lounsbury an "a**hole") and raised her voice. *See* Def. LRS at ¶ 10. Although denied by Plaintiff, Defendants assert that she also kneed Officer Busa in the abdomen and kicked him in the face. *See id.* at ¶ 11; *see* Pl. LRS at ¶ 11. Ultimately, Plaintiff was arrested for assault, interfering with/resisting arrest, and disorderly conduct and taken to MPD. *See* Def. LRS at ¶ 12.

---

[2] This summary is comprised of facts taken from the parties' respective Local Rule 56(a) statements and exhibits thereto. It derives principally from those facts about which there is no dispute, although as discussed *infra.,* there are significant disagreements as to how the events of March 18, 2018 unfolded.

[3] Meriden is a municipality and political subdivision of the State of Connecticut. *See* Def. LRS at ¶ 3.

Defendants maintain that all actions of Officers Lounsbury and Busa in their interactions with Plaintiff, to include the use force in effectuating her arrest, were reasonable. *See id.* at ¶ 13. Plaintiff however, states that she suffered a knee injury[4] because of an assault by the officers, and that there is a genuine issue of material fact as to whether Officer Lounsbury violated the Fourth Amendment when he first detained Plaintiff or thereafter whether the officers violated the Fourth Amendment when they used excessive force during her arrest. *See* Pl. LRS at ¶¶ 14, 16.

The parties present two distinct narratives of this case, which would normally preclude summary judgment. However, attached as exhibits to Defendants' motion are body-worn camera footage recorded by Officers Lounsbury and Busa (Ex. A-2) and video surveillance video captured by MPD depicting Plaintiff's arrival at the station and transfer to a holding cell post arrest (Exs. A-3). The Court may accept as true facts that are supported by video footage. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). The entire encounter between Plaintiff and the Defendant officers was captured on this footage, as was the moment she sustained her knee injury in the holding cell. And this footage, as detailed below, reveals that Plaintiff's narrative is demonstrably false.

*The Scene at Violi's*

Officer Lounsbury was first to encounter Plaintiff. In the footage, she is unstable on her feet; her speech is slow and slurred. By any reasonable perception, Plaintiff appears significantly impaired. Officer Lounsbury gave her the opportunity to call someone for transportation, but

---

[4] Plaintiff also claims that the arrest caused bruising to her arms, legs, neck and back, a black eye, and swelling on her head, as well as a fracture in her tibia and a shattered kneecap. *See* Pl. Add'l Facts, ECF No. 75-1, at ¶¶ 1, 5. She maintains that did not have these symptoms or injuries prior to her encounter with Officers Lounsbury and Busa. *See id.* at ¶ 5.

4

Plaintiff did not.[5] Officer Lounsbury handcuffed her, at which point Officer Busa arrived on the scene and was brought up to speed by Officer Lounsbury. Officer Busa then engaged with Plaintiff. She explained that she lives alone, that she has kids, and that no one was home. She told Officer Busa that her "friends" were still on scene in the basement of the restaurant. She identified one of her friends as "Mario."

Subsequently, an ambulance was called. The officers then spoke to the restaurant owner, the aforementioned Mario, who confirmed that he had called the police because he felt Plaintiff was too impaired to drive. He also confirmed that all the shower guests had left and that he had taken Plaintiff's purse, which he returned to the officers. Both officers then returned to speak to Plaintiff. Officer Busa explained the situation and spoke to her in a calm and rational manner. He placed his hand on Plaintiff's shoulder to keep her from standing up. Plaintiff, however, responded with escalating hostility and use of vulgarities—her speech and conduct reinforcing the assessment that she was heavily intoxicated or otherwise impaired.

When the ambulance arrived, she refused to move to the stretcher, continuing her verbal haranguing of the officers. She would not cooperate with the EMT who tried to intervene in a kind, patient, and rational manner. Plaintiff remained argumentative, further escalating her provocation of the officers (Officer Busa in particular) with such repeated commands as "Get the F**k away from me" or "Get your f**king arm off me" if the officers attempted to move her to the stretcher. Eventually, Plaintiff moved toward the stretcher, and in doing so lunged at Officer Busa. She appears to knee him in the torso area. Thereafter, Plaintiff was quickly and forcibly placed into the back of the patrol car. Officer Busa indicates that she kicked him in the head

---

[5] Plaintiff did, however, make demands for the officers to call "Mike" or "Robbie," who are Mike Lancaster, Plaintiff's ex-husband, and Robbie Abouchacra, Plaintiff's friend, who were both at one point officers of MPD. She does not indicate that either is a viable ride home, and her purpose of invoking their names or requesting that they be called is unclear.

during that process, and the EMTs on scene confirmed that they witnessed the Plaintiff assault Officer Busa. Officer Busa was offered medical assistance, which he declined. The entire episode from when Plaintiff lunged at Officer Busa and was then secured into the police vehicle took approximately 20 seconds. The footage is very dark during this 20 second period, but the initial assault is visible, and the footage that follows reinforces Officer Busa's contemporaneous report of an injury to his head. Under arrest, Plaintiff was then transported to MPD.

Until Plaintiff's assault of Officer Busa, at which point the decision was made to place her under arrest, the Defendant officers were merely trying to get Plaintiff to a hospital and to keep her from driving.

*The MPD Footage*

The first footage from MPD is in the sallyport, where people in custody are brought into the police station. When the officer who transported Plaintiff opened the back door to the vehicle, she was lying down. She would not or could not sit up. Repeatedly, Plaintiff told him she was "tied" and could not get up. He told her multiple times that she was not tied, but that she was cuffed. The officer tried to help Plaintiff out of the vehicle, but she appears incapable of bringing her legs to bear so that she could sit up and exit the vehicle. Eventually, with the help of a second officer, the first officer can lift and pull Plaintiff from the vehicle. Once standing, she immediately falls backward into the officer, who is able to keep her upright. Although still appearing to be quite intoxicated, she is not limping or in any noticeable discomfort. Plaintiff is placed in a holding cell.

Shortly after, an officer enters the cell. Plaintiff is seen, though not heard, screaming at him. He leaves. After a few moments, Plaintiff gets off the bench, walks toward the cell door and lifts her right leg, forcibly kicking her cell door. She immediately falls hard to the floor, where

6

she does not move. She lies on the floor for almost ten minutes. Eventually, two female officers enter the cell and help Plaintiff to her feet. At that point, Plaintiff is visibly favoring her left leg as she makes her way to the bench. She is clearly avoiding putting any weight on her right leg, and it takes both officers' efforts to complete their task. After the officers leave the cell, Plaintiff attempts to stand up, but immediately falls, clutching her right leg and knee. The footage from the holding cell makes clear that Plaintiff is in considerable pain after kicking the door and falling to the floor. [6]

**Discussion**

*Section 1983*

Section 1983 of Title 42 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." "The common elements to all § 1983 claims are: '(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Lee v. City of Troy*, 520 F. Supp. 3d 191, 205 (N.D.N.Y. 2021) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Further, a plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of

---

[6] Plaintiff's affidavit swearing to an alternative narrative is a remarkable mischaracterization of the record evidence. The Court finds particularly concerning Plaintiff's allegations that Officer Lounsbury "banged her against the car repeatedly": that he "slammed the car door on her leg several times"; and that the officers "manhandl[ed]" her. *See* Pl. Opp., ECF No. 75, at 7. Nowhere in the video evidence do these events occur. Plaintiff's dismissive response that the footage of the officers' interactions with the Plaintiff was intermittent or incomplete is belied by the footage itself. It is manifest that all interactions with Plaintiff were captured on the body cameras, regardless of whether some portions of the video are muted while the Defendant officers were conversing with other members of law enforcement and while disengaged from their interactions with Plaintiff.

that defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983'") (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991)). To "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020).

*Fourth Amendment*

"The Fourth Amendment prohibits 'unreasonable searches and seizures.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting U.S. CONST. AMEND. IV). "For a seizure to be reasonable, it must generally be supported by probable cause." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019). "Probable cause 'to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Martel v. Town of S. Windsor*, 562 F. Supp. 2d 353, 358 (D. Conn. 2008), *aff'd*, 345 Fed. App'x 663 (2d Cir. 2009) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

The Fourth Amendment also "prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Jamison v. Metz*, 541 F. App'x 15, 19 (2d Cir. 2013) (summary order). "A police officer violates the Fourth Amendment if the amount of force he uses in effectuating an arrest is objectively unreasonable in light of the facts and circumstances confronting the officer." *Lennon v. Miller*, 968 F.3d 150, 155 (2d Cir. 2020) (internal quotation marks and alterations omitted).

*Qualified Immunity*

Defendants' motion is framed through the doctrine of qualified immunity, so the Court limits its analysis to same.[7] Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity would be denied to an official only if (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official and (2) the right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). "Rights must be clearly established in a 'particularized' sense, rather than at a high level of generality, *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017), and while "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 743.

"Therefore, an official is entitled to qualified immunity if, considering the law that was clearly established at the time, the official's conduct was 'objectively legally reasonable.'" *Nazario v. Thibeault*, No. 3:21-CV-216-VLB, 2022 WL 2358504, at *8 (D. Conn. June 30, 2022) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010)). Moreover, qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting

---

[7] The Court notes that Fourth Amendment excessive force claims and qualified immunity defenses both examine the reasonableness of an officer's conduct, but that the analyses do ultimately diverge. For example, even if an officer's use of force amounted to a Fourth Amendment violation, that officer could still be entitled to qualified immunity if it was objectively reasonable for the officer to believe that his conduct was lawful. *See Pearson*, 555 U.S. at 244 ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law"); *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). Under this standard, even if there is a violation of a plaintiff's Fourth Amendment rights, there is liability only where "no officer of reasonable competence could have made the same choice in similar circumstances." *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003). As discussed *infra*, Plaintiff's claims here fall on their merits in either context for the same reason—Officers Lounsbury and Busa acted reasonably throughout their encounter with Plaintiff.

*Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice*, 873 F.3d at 166 (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

Whether under the first or second prong of the qualified immunity analysis, the Court concludes that there is no genuine issue of material fact as to whether qualified immunity applies to the officers in this case. It does.

Under the first prong of the qualified immunity inquiry, there is no genuine issue of material fact as to whether Officers Lounsbury or Busa violated the Fourth Amendment when Plaintiff was initially detained pending evaluation by EMTs or whether Officers Busa and Lounsbury used excessive force in effectuating her arrest. They did not.

Officer Lounsbury (and subsequently officer Busa) had probable cause to detain Plaintiff under the authority of Conn. Gen. Stat Section 17a-683(a). The statute provides that a police officer finding a person "who appears to be intoxicated in a public place and in need of help" may, on consent, assist that person to their home, a treatment facility, or a hospital. An "intoxicated person" is defined as someone "whose mental or physical functioning is substantially impaired as a result of the use of alcohol or drugs." *See* Conn. Gen. Stat Section 17a-680(13). Here, Officer Lounsbury was dispatched to the scene because the restaurant owner perceived Plaintiff to be unable to drive. Upon his arrival, Officer Lounsbury was confronted with a person, who, by all appearances, was significantly impaired and perhaps heavily intoxicated. She was alone, as the other guests at the baby shower had all left. She was found close to her vehicle. After Officer Busa arrived, Plaintiff indicated that there was no one at her home and she did not identify anyone from whom she could get a ride. Accordingly, both Officers Lounsbury and Busa had probable cause to detain Plaintiff long enough to find a

solution to the situation with which they were confronted.[8] *Cf. Palmer v. New Britain Gen. Hosp.*, No. 3:05-CV-942 (RNC), 2009 WL 378646, at *4 (D. Conn. Feb. 13, 2009) (officers did not have probable cause where plaintiff repeatedly stated that he did not want to go to a hospital for detoxification; he was able to walk and climb into an ambulance without difficulty; the medical technicians found him to be "alert"; and officers did not ask him whether he could arrange a ride home).

Nor did either officer use excessive force against Plaintiff. As detailed above, Defendants Lounsbury and Busa did not assault Plaintiff as she claims. They did not bang her against the car or slam the car door on her leg. The only force used was when Officer Lounsbury placed her in protective custody by handcuffing her and thereafter when Officer Busa placed her back in the vehicle after she assaulted him. Nor is there any question as to when and how Plaintiff's knee was injured. Her injury was self-inflicted when she kicked her holding cell door.[9] As a factual matter, on the record evidence, Plaintiff's claims of excessive force are simply specious. No reasonable juror viewing the video footage could conclude that either officer used excessive force against her.

As to the second prong, even if Officer Busa's conduct in placing Plaintiff in the back of the vehicle involved an unreasonable use of force, Officer Busa's belief that his use of such force was lawful was objectively reasonable. Plaintiff escalated her verbal assault to a physical assault and thereafter struggled with Officer Busa as he attempted to place her under arrest. At that point, Plaintiff posed a demonstrated risk of harm to Officer Busa, making it objectively

---

[8] Plaintiff relies heavily upon the "on consent" requirement of the statute. And ultimately, Plaintiff would not give consent. This does not, however, render unreasonable the officers' efforts to obtain such consent by calling an ambulance and asking that Plaintiff be evaluated. Nor does it undermine the probable cause they had to detain her so they could undertake such measures.

[9] This conclusion is frankly self-evident upon review of the surveillance footage. However, Defendants also presented expert testimony to confirm that the injury she suffered is attributable to her kicking of the cell door. *See* Def. LRS, Ex. F-1.

reasonable for him to believe that using force to physically contain Plaintiff inside the patrol car was not unlawful. Plaintiff identifies no applicable precedent that would have placed Officer Busa on notice that his belief was either wrong or objectively unreasonable. As discussed, under the second prong of qualified immunity, "[a] right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quotations and citation omitted). Accordingly, the second prong is established if the officer's belief that his conduct was lawful was objectively reasonable. *See Higazy v. Templeton*, 505 F.3d 161, 169–70 (2d Cir. 2007) (finding that the qualified immunity defense protects an official if it was "objectively reasonable for him at the time of the challenged action to believe his acts were lawful") (internal quotations omitted).

In sum, viewing the record in a light most favorable to Plaintiff, no reasonable factfinder could find that either Officer Busa's or Officer Lounsbury's conduct was objectively unreasonable. *See Miller,* 66 F.3d 416, 420. Once she was detained, the officers attempted repeatedly to give Plaintiff the option of calling someone to give her a ride home or going to the hospital, as the parties agree that she was unable to drive herself home. Her speech was slurred; she had trouble standing on her own; and she repeatedly yelled and cursed at the officers. In refusing to go to the hospital, Plaintiff belligerently assaulted Officer Busa—both verbally and physically—at which point the officers placed her under arrest.[10] Body-warn camera video captures Officer Busa struggling to get Plaintiff into the back of the police car, but also captures

---

[10] There is little question that Officers Lounsbury and Busa had probable cause to arrest Plaintiff after she assaulted Officer Busa. Indeed, at a minimum, Conn Gen. Stat. Section 53a-182a provides that "[a] person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person…"

Plaintiff lunging at and assaulting Officer Busa immediately prior to that struggle. Officers Busa and Lounsbury are accordingly protected by qualified immunity.

*Claims against Meriden*

Because Officers Busa and Lounsbury did not violate the Plaintiff's Fourth Amendment rights either when she was first detained or when she was ultimately arrested, Plaintiff's claims against the City of Meriden fail as a matter of law. *See Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019) ("It is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).[11]

*State Law Claims*

"[T]he district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996). Notwithstanding, courts regularly decline to exercise supplemental jurisdiction where all federal claims are disposed. *See Est. of Ferrara v. United Pub. Serv. Emps. Union*, No. 3:18-CV-0527 (VAB), 2020 WL 7714542, at *12 (D. Conn. Dec. 29, 2020); *Salatto v. City of Milford*, No. 3:08-CV-1071 (MRK), 2012 WL 774612, at *15 (D. Conn. Mar. 7, 2012); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases). The remaining issues raised by the

---

[11] The parties do not address the claims brought against Chief Cossette. He is not alleged to have had any personal involvement in the alleged constitutional deprivations. *See Wright*, 21 F.3d at 501 ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991)). Rather, he appears to be named as a "policy maker" for the City of Meriden. *See Monell,* 436 U.S. at 691 ("a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under [Section 1983] on a *respondeat superior* theory."); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under [Section 1983] attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official…responsible for establishing final policy…"). Accordingly, as no constitutional violations occurred, nor is Chief Cossette alleged to have had any personal involvement in the arrest, the claims against him fail as well.

Defendants involve, *inter alia,* the scope and nature of municipal immunity under Connecticut law, issues better decided by state courts. The Court therefore declines to exercise supplemental jurisdiction over Plaintiff's common law and statutory claims.

**Conclusion**

For the foregoing reasons, Defendant's motion for summary granted (ECF No. 70) is GRANTED as to the Section 1983 claims. The Court declines to exercise supplemental jurisdiction over the remaining state law claims. The Clerk of Court is directed to enter judgment as to all Defendants on Counts 1, 2, 3, 6, and 7 and remand the remaining state law claims in Counts 4, 5, 8, and 9 to the Superior Court of Connecticut in the Judicial District of New Haven.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September 2023.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE